MARSHALL A. RIES & another, trustees, *vs.* ELLIS ROME & another.

Plymouth. February 3, 1958. — April 14, 1958.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, & CUTTER, JJ.

*Fiduciary. Trust,* Constructive trust. *Broker,* Broker's duty of fidelity. *Equity Pleading and Practice,* Master: conclusion from findings; Decree; Appeal.

It is the duty of the trial court in a suit in equity, and of this court on appeal from the final decree, to cause to be entered the proper final decree required by the subsidiary findings of a master and the correct inferences therefrom. [380]

The mere fact that an experienced real estate man, a prospective purchaser of property, communicated certain information relative to the property and his plans for its expansion to the owner's broker, who was not shown to have agreed to treat such information as confidential and as agent for the owner could not properly have so agreed, did not establish any fiduciary relationship or duty of the broker to the prospective purchaser which could be the basis of the prospective purchaser's securing equitable relief on the ground of a constructive trust or damages against one to whom the broker disclosed such information and to whom the owner through the broker ultimately sold the property. [381–383]

A ground for relief in a suit in equity argued by the plaintiff before this court on appeal but not raised by him in the original bill or in two amendments thereof allowed or in a third amendment sought but denied was not considered by this court. [383]

BILL IN EQUITY, filed in the Superior Court on July 25, 1955.

There was an interlocutory decree by *Brogna,* J., overruling a demurrer to the bill. By *O'Connell,* J., there were an interlocutory decree confirming a master's report, a denial of a motion to amend the bill, and a final decree dismissing the bill.

*Joseph Schneider,* for the plaintiffs.
*Edward J. Barshak,* for the defendants.

CUTTER, J. This bill in equity originally sought the imposition of a constructive trust in the plaintiffs' favor upon

certain real estate owned by the defendants, one Rome and his wife, on the ground that it had been purchased by them in violation of a fiduciary duty owed by them to the plaintiffs. The bill was later twice amended (a) to allege that the plaintiffs communicated to the defendants certain confidential views about real estate development and that the defendant Ellis Rome agreed to act as their broker in acquiring suitable land, and (b) to ask, in the alternative, money damages. The judge refused to allow a further amendment of the bill asserting that the defendants were constructive trustees of the land because they knowingly participated in an alleged breach of a supposed fiduciary obligation to the plaintiffs on the part of one Murdock, broker for the vendor from whom the defendants purchased the land.

The case was referred to a master. In compliance with Rule 90 of the Superior Court (1954) the master with his report filed summaries of evidence underlying specified findings to which the defendants had filed objections. The defendants have appealed from interlocutory decrees overruling a demurrer to the bill and confirming the master's report and, for the purpose of preserving their earlier claims of appeal, have also appealed from the final decree dismissing the bill. See *Foot* v. *Bauman*, 333 Mass. 214, 219. The plaintiffs appeal from the final decree and, by a bill of exceptions, present an exception to the denial of their motion for leave further to amend their bill.

The master found the following principal subsidiary facts. The plaintiffs were experienced real estate developers. The defendants conduct a real estate business representing "customers as general brokers and on occasions" buying for their own account. Where they coöperated with a broker having an exclusive agency on particular property, it was the practice for the latter broker "to divide the commission" with them if they sent a purchaser to him. "Whenever this occurred the exclusive broker took over the customer and the forwarding . . . broker had no further direct dealings with the customer."

Early in January, 1955, the plaintiffs told the defendants that they wanted to buy land near Hanover for a housing development. During the next two months the defendants caused to be shown to the plaintiffs various parcels including a glass factory property, owned by certain corporations but controlled by a husband and wife through stock ownership, so that the couple for the purposes of this case can be regarded in practical effect as the owners. Murdock had been given "an exclusive agency for the sale of [the] land and business." The plaintiffs met with Murdock to discuss the property and told him that they had been referred to him by Rome. Murdock mentioned a price of $50,000 but "thought that an offer of $40,000 . . . might be acceptable to the owners." Murdock had been given "no definite sales price but simply an authority to receive . . . and submit . . . offers to the owners for their consideration."

During March and April, 1955, the plaintiffs spent most of their time examining the glass factory's business. Murdock facilitated the plaintiffs' investigation in various ways and conferred with the plaintiffs frequently. At these meetings the plaintiffs "confided in him the results of their investigation . . . into the company's affairs and what must be done to make it a successful business." They found little value in it as then operated, but felt that the land and factory building were "worth purchasing . . . at a far less price than was quoted . . . by Murdock."

On May 2, 1955, the plaintiffs made to Murdock an offer of $10,000 for all the factory assets "excluding bills payable and accounts receivable." On May 3 they gave to Murdock a deposit check of $1,000, to his order, on the back of which were indorsed a summary of the offer and the statement, "Subject to agreements of Purchase and Sale satisfactory to both buyer and seller." On May 4 Murdock told one plaintiff by telephone that the offer "had been accepted by the owners." On May 6 the plaintiffs and Murdock examined a purchase agreement prepared for the signatures of the president and clerk of the corporations which in fact owned the building and with a "last blank line . . . for

signing by the plaintiffs." The plaintiffs "stated that they would take one of the agreements to their own lawyer and have him look over . . . and approve it. . . . The meeting closed with the common understanding . . . that the property was to be held for the plaintiffs and would be given to them just as soon as the plaintiffs returned the agreements duly signed and paid the balance of the consideration."

On May 9 Murdock told one plaintiff by telephone that the "property had been sold to another party" but declined "to give . . . information . . . as to who the purchaser was." The deposit check was returned. "Actually, there was no other agreed purchaser . . . on May 9 when Murdock telephoned." On May 10 at a real estate board meeting, Murdock purported to tell Rome that he "had an offer of $10,000 for the factory, which I have lost," and Rome answered, "I will buy it." On the morning of May 11, 1955, Rome gave Murdock a deposit check for $1,000, and, on the same day, Rome signed as buyer the same agreement which had been prepared for the plaintiffs' signatures. This purchase was eventually completed for $10,000. The value of the assets sold was found to be $23,500 in May and June, 1955.

"Upon the foregoing subsidiary facts," the master made "ultimate conclusions of material facts," which, so far as here relevant, are stated below: 1. "The plaintiffs, as principal, never hired the named brokers [the Romes and Murdock] . . . to buy the property." 2. There was with respect to "the purchase and sale of property . . . no fiduciary relationship . . . between the plaintiffs and the defendants." 3. On May 5 "the owners had accepted [the] plaintiffs' offer . . . and there remained nothing further to be done except for the parties to sign a written . . . agreement . . . satisfactory to both the agreed buyers and sellers." 4. A "fiduciary relationship did exist between Murdock and the plaintiffs." Although "Murdock was not employed by the plaintiffs to buy the property for them . . . he did accept valuable information confidentially conveyed to him by the plaintiffs, and in violation of such confidential

relationship, in concert with [the] defendants . . . he . . . abused such confidence to the unjust enrichment of both himself and [the] defendants . . . and to the prejudice of the plaintiffs." The plaintiffs communicated to Murdock the results of their investigations "largely to justify why their offer . . . was so low in comparison with Murdock's original quotation." 5. Realizing that the low offer meant only a "modest commission" which "would have to be shared" with the defendants, Murdock "intentionally . . . decided to prevent a sale . . . to the plaintiffs." 6. When Murdock on May 9 told one of the plaintiffs that the "owners had . . . agreed to sell . . . to another . . . no such . . . sale had been . . . even contemplated by the owners." 7. "[A]fter acceptance of the plaintiffs' offer . . . Murdock communicated with [the] defendants . . . and told them of the . . . offer and its acceptance . . . and disclosed to the Romes information which he had confidentially received from the plaintiffs" and obtained the defendants' agreement to purchase on the same terms, the defendants waiving any commission, so that Murdock would receive the whole commission. On May 11, when they signed the agreement, the defendants knew that the plaintiffs "were the named buyers . . . in that agreement." 8. With "full knowledge of Murdock's breach of a fiduciary obligation owed by him to the plaintiffs, [the] defendants . . . actively participated in such breach, and by reason thereof the plaintiffs were prevented from completing their purchase of the property to their . . . loss."

1. The substantial question raised by these conclusions is whether there were subsidiary findings, so far as justified by the evidence summarized in accordance with Rule 90, which in turn justified the master's conclusion that Murdock owed a fiduciary obligation to the plaintiffs. It is the duty of the trial court, and of this court upon appeal from the final decree, to see that the final decree is such as the law requires upon the subsidiary facts found by the master and the proper inferences therefrom. *Foot* v. *Bauman,* 333 Mass. 214, 219.

The evidence in support of the finding that the plaintiffs "confided" the results of their investigations to Murdock was testimony by one plaintiff, (a) giving a detailed account of the investigations of the factory's business; (b) "that [the] plaintiffs bought eighty contiguous acres . . . in connection with plans for future . . . expansion"; and (c) that "all of this information . . . [was] communicated by the plaintiffs to Murdock, whom they trusted as a fellow real estate man and who led them on so to do, being dined frequently by Murdock who was especially friendly . . . to them at all times." This evidence shows only that they told Murdock certain facts. Accordingly, we construe the master's subsidiary finding as meaning simply what the evidence thus justifies, bare communication of the facts to Murdock.

There is no suggestion in the evidence, or in the subsidiary finding as thus construed, of agreement by Murdock to treat the information as secret, even if he could properly have made such an agreement. He was not the plaintiffs' agent, as the master was thoroughly justified in finding. *DiBurro v. Bonasia*, 321 Mass. 12, 14–16. See *Follansbee v. Photiou*, 326 Mass. 638, 640. Compare *Berenson v. Nirenstein*, 326 Mass. 285, 289, where, on demurrer, allegations of a full agency relationship between a broker and a prospective purchaser presented a basis for equitable relief against the broker who acted in violation of his fiduciary relationship and one who participated with the broker. Indeed, Murdock, as the broker and agent of the beneficial owners of the property, was under a duty to disclose to them matters learned in the conduct of the agency and relevant to its success. Restatement: Agency, § 381. As the plaintiffs, experienced real estate men, should have known, he was not entitled to receive information pertinent to the subject matter of the agency which he was not at liberty to place at his principal's disposal. Accordingly, the subsidiary findings, properly interpreted, do not justify the ultimate conclusions (see those numbered 4 and 8 above) that a fiduciary relationship existed between Murdock and the plaintiffs. We think that the relationship between him and

the plaintiffs was no more than a business relationship. *Swinton* v. *Whitinsville Savings Bank*, 311 Mass. 677, 678 (seller of house fails to disclose presence of termites). See *Snow* v. *Merchants National Bank*, 309 Mass. 354, 360–362 (bank officer giving investment advice to bank customer); *Plumer* v. *Luce*, 310 Mass. 789, 798–799 (investor and investment house representative); *National Shawmut Bank* v. *Hallett*, 322 Mass. 596, 602 (debtor-creditor relationships not made fiduciary by the existence of mutual respect and confidence); *Rockland-Atlas National Bank* v. *Barry*, 336 Mass. 220, 223; *Yamins* v. *Zeitz*, 322 Mass. 268, 273; Scott, Trusts (2d ed.) §§ 462.1, 462.2, 505; Pomeroy, Equity Jurisprudence (5th ed.) § 956a; Note 20 A. L. R. (2d) 1140, 1148–1149. See also as to efforts to make disclosures of information "confidental," *Laughlin Filter Corp.* v. *Bird Machine Co.* 319 Mass. 287, 289–290. Compare cases where there was a recognized type of confidential relationship, fiduciary in character. *Durfee* v. *Durfee & Canning, Inc.* 323 Mass. 187, 196. *Sher* v. *Sandler*, 325 Mass. 348, 353. *Mendelsohn* v. *Leather Manuf. Corp.* 326 Mass. 226, 233–235. Compare also *Akin* v. *Warner*, 318 Mass. 669, 674; *Karal* v. *Marken*, 333 Mass. 743, 745–746.

The plaintiffs rely on *Warsofsky* v. *Sherman*, 326 Mass. 290. See Note 31 B. U. L. Rev. 101. That case is distinguishable. There, the relationship between a coöperative bank officer and a loan applicant created a special obligation based upon the bank officer's position, which was reinforced by the statutory provisions there mentioned (see page 294). There the information was necessarily transmitted on a confidential basis, as an essential step in securing a loan, to one who, by reason of his position, owed a duty to use it for only one purpose. In the present case, experienced real estate operators incautiously transmitted information to one, with whom they were, or should have been, dealing at arm's length (see *Evatt* v. *Willard D. Martin, Inc.* 302 Mass. 414, 416), and who was under no fiduciary duty not to compete with them. *Harper* v. *Adametz*, 142 Conn. 218, 55 A. L. R. (2d) 334, also relied upon by the plaintiffs, is

also distinguishable. See 35 B. U. L. Rev. 604. Compare 54 Mich. L. Rev. 714.

The master's conclusion that the Romes were not the plaintiffs' brokers effectively disposes of the plaintiffs' contention that Rome "agreed to act as broker and agent for the plaintiffs" on any theory contained in the bill and its first two amendments. What has been said establishes that there could also have been no relief under the bill even if amended to allege that the defendants contributed to a breach of a fiduciary duty owed by Murdock to the plaintiffs. There was no such duty.

2. The plaintiffs now argue that relief should be granted on the theory that the defendants "knowingly collaborated with Murdock in interfering with the plaintiffs' business relationship with the" owner of the property "and therefore must pay damages in the amount of the plaintiffs' economic loss," thus essentially seeking to recover in tort, on the principles mentioned in *Owen* v. *Williams*, 322 Mass. 356. Restatement: Torts, § 766. See Prosser, Torts (2d ed.) § 107; Harper and James, Torts, §§ 6.9, 6.11. The plaintiffs have not included, even in their proposed amended bill, allegations or prayers for relief based upon the theory that property acquired by allegedly tortious interference with a potentially advantageous business relationship should be held in constructive trust for them, or, as an alternative, seeking damages. This is not a case for authorizing the allowance, at a very late date in the suit, of an amendment for which the plaintiffs, on their third attempt at stating the basic theory of their bill, have not even asked. In the absence of proposed pleadings on such a theory, it is unnecessary to consider whether such a bill would state grounds for relief in equity.

3. The demurrer to the original bill was correctly overruled. If the proof had sustained the allegations, as it did not, relief in equity could have been granted. *Berenson* v. *Nirenstein*, 326 Mass. 285.

4. The interlocutory decrees overruling the demurrer to the original bill and confirming the master's report are

affirmed. The final decree dismissing the bill is affirmed with costs to the defendants. The exceptions to the denial of the plaintiffs' motion to amend the plaintiffs' bill are overruled.                                      *So ordered.*