[No. A039292. First Dist., Div. One. Dec. 16, 1988.]

NGAN TANG NGUYEN et al., Plaintiffs and Appellants, v. JOHN L. SCOTT et al., Defendants and Respondents.

COUNSEL

John D. Nelson and Jue & Nelson for Plaintiffs and Appellants.

Harry I. Price, Daniel L. Casas and Reynolds, Roux & Price for Defendants and Respondents.

OPINION

NEWSOM, Acting P. J.—Ngan Tang Nguyen and Ngoc Tho Thi Vu Nguyen (hereafter appellants) appeal from a judgment of dismissal entered on an order sustaining a demurrer to their second amended complaint. The grievance stated in this amended complaint arose in the course of the litigation. The appellants originally filed on August 19, 1986, a complaint against Barclays Bank of California as trustee for California Dental Guild (hereafter Barclays) praying for partition of certain real property. Barclays filed a

cross-complaint that similarly prayed for partition and sale of the property and moved for a judgment on the pleading. Shortly thereafter, John L. Scott, an individual, filed a notice on October 1, 1986, that he had acquired Barclays' interest in the property with authority to pursue the cross-complaint in its name. In response, appellants filed an answer to the cross-complaint containing "supplemental allegations modifying and partially rescinding complaint herein" and opposed the motion for judgment on the pleading. The court first denied the motion for judgment on the pleading as untimely since a cross-defendant had not yet filed an answer. Barclays and John L. Scott renewed the motion alleging that the cross-defendant had actually consented to entry of default against it. The court then granted the motion for judgment on the pleading subject to appellants' right to amend the complaint within 30 days.

On January 20, 1987, appellants filed a first amended complaint stating the causes of action involved in this appeal. The complaint named as additional defendants John L. Scott, J. & P. Scott, Inc., Terry John O'Brien (an officer of J. & P. Scott, Inc.), Joseph Monck, and Raymond Love (both employees of Barclays). The first cause of action claimed $127,000 in damages from John L. Scott. The second cause of action sought to require John L. Scott and J. & P. Scott, Inc., as constructive trustees, to convey a one-half interest in the property to appellants for a purchase price of $325,000. The third cause of action alleged a conspiracy among all the defendants and prayed for general damages of $127,000 and punitive damages of $10 million. Defendants again demurred to the complaint, and appellants moved for leave to file further amendments. Granting appellants' motion to amend the complaint, the court took the demurrer off calendar.

On April 1, 1987, appellants filed the second amended complaint at issue here. Later, they dismissed the complaint without prejudice against Barclays, Joseph Monck, and Raymond Love. The remaining defendants, John L. Scott, J. & P. Scott, Inc., and Terry John O'Brien, once again demurred. On May 21, 1987, the court sustained the demurrer without leave to amend.

■ In reviewing the sufficiency of the complaint against the general demurrer, "[a]ll allegations are taken as true even though their proof appears unlikely . . . ." (*Stanson* v. *Brown* (1975) 49 Cal.App.3d 812, 814 [122 Cal.Rptr. 862]; *Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 828 [122 Cal.Rptr. 745, 537 P.2d 865].) " '[T]he complaint must be liberally construed with a view to attaining substantial justice among the parties.' " (*Glaire* v. *La Lanne-Paris Health Spa, Inc.* (1974) 12 Cal.3d 915, 918 [117 Cal.Rptr. 541, 528 P.2d 357].) The court is "not limited to plaintiffs' theory of recovery in testing the sufficiency of their complaint against a demurrer, but instead must determine if the *factual* allegations of the complaint are

adequate to state a cause of action under any legal theory." (*Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 103 [101 Cal.Rptr. 745, 496 P.2d 817].) "Mistaken labels and confusion of legal theory are not fatal; if appellant's complaint states a cause of action on any theory, he is entitled to introduce evidence thereon." (*Porten* v. *University of San Francisco* (1976) 64 Cal.App.3d 825, 833 [134 Cal.Rptr. 839].)

As alleged in the complaint, in 1976 appellant Ngan Tang Nguyen and Phu Loc Truong (hereafter Truong) each purchased an undivided one-half interest in an 18-unit apartment building located at 1865 Bush Street in San Francisco. Ngan Tang Nguyen acted as the managing owner of the apartment. Before the commencement of this litigation, he placed his interest in the names of himself and his wife, Ngoc Tho Thi Vu Nguyen.

John L. Scott (hereafter Scott) is a licensed real estate broker and the sole shareholder of J. & P. Scott, Inc., a California corporation (hereafter Scott, Inc.). In 1983, Scott, Inc., entered into an agreement, termed a "Service Contract," with California Canadian Bank as trustee for the California Dental Guild. The agreement contemplated that from time to time the bank would request Scott, Inc., to offer investments in promissory notes secured by a deed of trust on real property. Scott, Inc., would guarantee payments on the notes but would earn a potential profit by paying the bank a lower rate of interest than that which was actually payable on the note. In 1985, Barclays Bank of California acquired the California Canadian Bank and assumed the Service Contract.

During 1985, appellants' cotenant, Truong, encumbered his one-half interest in the property as security for a loan and then defaulted on loan payments. To avert foreclosure, on January 6, 1986, he obtained a $285,000 loan from Scott, Inc., secured by a second deed of trust. Scott, Inc., sold the note to Barclays for the loan balance at an interest rate 2.25 percent below that payable by Truong. When Truong immediately defaulted on the new loan, Barclays gave Scott a power of attorney to pursue creditor's remedies against Truong. Acting under the power of attorney, Scott filed a complaint for specific performance of the rents and profits clause of the Truong note and initiated nonjudicial foreclosure proceedings on the deed of trust. At a foreclosure sale on August 19, 1986, Barclays acquired Truong's one-half interest in the property for a bid of $320,530.95.

During the foreclosure proceedings, appellants negotiated with Truong to acquire his one-half interest in the property, but the period of redemption expired before they could conclude a deal. Scott refused to delay foreclosure or otherwise accommodate them.

Following the foreclosure, appellants again tried to purchase the property by negotiating with Scott who represented Barclays under the power of attorney. The complaint recites that Scott "sought to extort a high price" for the property. On September 9, 1986, appellants nevertheless submitted an offer to Scott's counsel to purchase the property for $330,000. On September 16, 1986, Scott's attorney refused the offer in writing. As directed by his power of attorney, Scott made some efforts to sell the property to a third party, and purporting to act on behalf of appellants as well as Barclays, he secured at least one offer to purchase the property. But the complaint alleges on information and belief that Scott did not communicate either their offer or the third party's offer to Barclays. Instead, he pursued a secret plan to purchase the property for himself. "SCOTT's actions in appearing to seek to arrange a sale were done for the purpose of lulling [appellants] into a false sense of security." On September 22, 1986, Scott in fact purchased Barclays' one-half interest in the property for $325,000. Appellants were not notified of the sale "until the end of September, 1986."

Although they originally asked for a partition by sale of the property, appellants now seek relief as prospective purchasers of their cotenant's one-half interest in the property. In this appeal, we need consider only the sufficiency of the first and second causes of action. Upon dismissing the complaint against Barclays, appellants have necessarily abandoned the third cause of action alleging conspiracy. Our consideration of the parties may be similarly narrowed. As we have noted, Barclays entered into the Service Contract with Scott, Inc., and granted the power of attorney to Scott individually. Since Scott is alleged to be the sole shareholder of Scott, Inc., the allegations support the inference that the acts of the one should be imputed to the other. (*Wenban Estate, Inc.* v. *Hewlett* (1924) 193 Cal. 675, 695.) But the first and second causes of action do not mention the remaining respondent, Terry John O'Brien, who is named only in the third cause of action that appellant has now abandoned. Our analysis thus will refer only to Scott and Scott, Inc.

While the first cause of action seeks damages and the second seeks to impose a constructive trust, both are premised on the alleged breach of a duty owed by a licensed real estate broker to prospective purchasers. We therefore face the threshold question of whether the complaint alleges facts from which it may be inferred that Scott acted in the capacity of a real estate broker.

Scott's role in the transactions eludes easy categorization. The "Service Contract," appended as exhibit 1 to the complaint, contained a clause explicitly describing Scott, Inc., as an independent contractor; other provisions, however, tended to create an agency relationship. For example, Scott,

Inc., was bound to comply with all written instructions of the bank relating to the notes and remained responsible for collecting payments due on the notes and providing the bank with relevant financial information. Under these allegations, the existence of an agency was a question of fact to be resolved at trial. But can it be inferred that the agency relationship was that of a real estate broker? Business and Professions Code section 10131 provides: "A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others: . . . (e) Sells or offers to sell, buys or offers to buy, or exchanges or offers to exchange a real property sales contract, or a promissory note secured directly or collaterally by a lien on real property or on a business opportunity, and performs services for the holders thereof." Scott, Inc., dealt with promissory notes secured by a lien on real property, and it was compensated by receiving the spread between the interest rate payable to the original holder of the notes and the reduced interest rate payable to the purchaser of the notes. The complaint does not allege, however, that Scott, Inc., acted "for another or others" in dealing with the promissory notes. It alleges rather that Scott, Inc., itself was "in the business of making distress loans at high rates of interest . . . ." This allegation in itself indicates only that the corporation acted as a lender engaged in selling loans to other lenders.

The power of attorney, appended as exhibit 2 to the complaint, unquestionably created an agency relationship, broadly authorizing Scott to act in the bank's behalf, but we must again inquire whether Scott acted as a real estate broker. ■ A power of attorney with respect to real estate may be exercised by a person not possessing a real estate broker's license. Business and Professions Code section 10133 specifically provides: "(a) The acts described in Section 10131 are not acts for which a real estate license is required if performed by: . . . (2) A person holding a duly executed power of attorney from the owner of the real property with respect to which the acts are performed." However, if a power of attorney actually contemplates real estate brokerage services, the courts will look to the substance of the agreement. For example, a person cannot evade the licensing requirements of the Real Estate Act by the device of securing powers of attorney from prospective clients. (*Richardson* v. *Roberts* (1962) 210 Cal.App.2d 603, 607 [26 Cal.Rptr. 829].)

■ Under the power of attorney at issue here, Scott agreed that, if Barclays should purchase the property on foreclosure, he would "use best efforts to sell or otherwise dispose of the above-described property with all reasonable speed upon terms and conditions prevailing in the market at that time, . . ." The language authorizes Scott to perform acts "for another"

that fall within the description of real estate brokerage. Business and Professions Code section 10131, subdivision (a), defines a real estate broker as a person who "[s]ells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property or a business opportunity."[1] But did Scott in fact act as a broker? Though authorized to do so, he may have retained the services of other real estate brokers rather than acting himself in that capacity. The complaint is obscure on this point. It does allege, however, that Scott advertised the property by posting a "For Sale" sign with his telephone number. This allegation supports an inference that he acted in a professional capacity.

The allegations concerning the power of attorney also present the question whether Scott acted "for a compensation or in expectation of a compensation" within the meaning of Business and Professions Code section 10131. Under the power of attorney, he was not entitled to a commission in marketing the property. The Service Contract, however, broadly required him to comply with the Bank's instructions regarding its investments in secured promissory notes. Since this contract established a remunerative relationship between Scott and Barclays, it may be inferred that actions taken under it, such as exercising the bank's power of attorney, were done with the expectation of personal gain and thus were "for compensation" within the meaning of section 10131.

■ A real estate broker has a fiduciary relationship to his principal that obliges him to act in the principal's best interest. ■ Attempting to come within this rule, appellants allege that Scott acted "in the capacity of a dual agent" on behalf of "dual principals," i.e., appellants and Barclays. Despite the dangers of conflict of interest, real estate brokers in California commonly do act as dual agents of both seller and buyer. ■ But the complaint's allegations of dual agency are legal conclusions that should be disregarded in considering the sufficiency of the demurrer. (4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 340, p. 393.) ■ Other allegations rebut any inference that appellants authorized Scott to represent them or that they acquiesced to or ratified his activity in soliciting purchase offers from third parties. The complaint states that appellants relied on Scott to transmit their offer to Barclays "out of necessity" since he held Barclays's power of attorney to deal with the property. They in fact attempted to circumvent him by negotiating directly with Barclays. The complaint

---

[1] On its face, the language of the power of attorney appears to come within the definition of a listing agreement. Business and Professions Code section 10027, subdivision (c), defines the term "listing" as "[a]n agreement by which a person who is engaged in the business of promoting the sale or lease of business opportunities or real estate agrees to render to an owner or lessee of such property any services, to promote the sale or lease of said property."

further alleges that "SCOTT attempted to deal with the property as if he had authority to do so on behalf of himself and NGAN. A gratuitous agency as it were."

These allegations compel the conclusion that Scott was not appellants' agent but acted exclusively as an agent for the seller, Barclays. ■■ This conclusion, however, is not fatal to appellants' case. In *Ward* v. *Taggart* (1959) 51 Cal.2d 736 [336 P.2d 534], the court upheld a purchaser's cause of action against a real estate broker in the absence of an agency relationship. The question becomes whether *Ward* should apply to the facts alleged in the complaint.

In that case, the plaintiff, Ward, requested a real estate broker, Thomsen, to look for attractive investment property in Los Angeles. Another real estate broker, Taggart, told Thomsen that he had an exclusive listing for 72 acres of land owned by Sunset Oil. Ward directed Thomsen to submit an offer for the land through Taggart for $4,000 per acre. Taggart promised to convey the offer to Sunset Oil but later informed Thomsen that the company would not accept less than $5,000 per acre. Upon receiving this advice, Ward authorized Thomsen to make an offer on those terms. Taggart informed him that Sunset accepted the offer. At the closing, however, title to the property appeared in the name of one of Thomsen's associates. Taggart offered elaborate explanations for this surprising circumstance, and Ward was persuaded to buy the property. Afterwards, Ward learned that Taggart had never held a listing on the property and had never presented his $4,000 offer to Sunset. "Instead, he presented his own offer of $4,000 per acre, which Sunset accepted. He falsely represented to [Ward] that the least Sunset would take for the property was $5,000 per acre, because he intended to purchase the property from Sunset himself and resell it to plaintiffs at a profit of $1,000 per acre. All the reasons he gave for the unusual handling of the sale were fabrications." (51 Cal.2d at p. 740.)

Ward brought an action against Taggart alleging fraud and received a jury verdict awarding him approximately $72,000 in compensatory damages, the amount of Taggart's secret profit on the transaction. On appeal, the court found that the record would not support recovery either on a theory of fraud or on an alternative theory of breach of the fiduciary duty owed by an agent to his principal. With respect to the fraud theory, the record was devoid of evidence that Ward had suffered any out-of-pocket loss as required by Civil Code section 3343 since the property was worth at least the $5,000 price he paid for it. To support the alternative theory, there was "no evidence of an agency or other fiduciary relationship" between Ward and Taggart. (51 Cal.2d at p. 741.) Ward dealt at arms-length with Taggart through his agent, Thomsen.

In a concise paragraph demanding careful analysis, the court nevertheless held that the jury verdict could be sustained on equitable grounds: "Even though Taggart was not plaintiff's agent, the public policy of this state does not permit one to 'take advantage of his own wrong' (Civ. Code, § 3517), and the law provides a quasi-contractual remedy to prevent one from being unjustly enriched at the expense of another. [Fn. omitted.] Section 2224 of the Civil Code provides that one 'who gains a thing by fraud . . . or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.'" (51 Cal.2d at p. 741.) As a real estate broker, Taggart had the duty to be honest and truthful in his dealing. (See Bus. & Prof. Code, §§ 10150, 10176; *Rattray* v. *Scudder* (1946) 28 Cal.2d 214, 222-223 [169 P.2d 371, 164 A.L.R. 1356].) The evidence is clearly sufficient to support a finding that Taggart violated this duty. "Through fraudulent misrepresentations he received money that plaintiffs would otherwise have had. Thus, Taggart is an involuntary trustee for the benefit of plaintiffs on the secret profit of $1,000 per acre that he made from his dealings with them." (*Ward* v. *Taggart, supra,* 51 Cal.2d at pp. 741-742.)

Unlike the defendant in *Ward,* Scott is not charged in the complaint with any misrepresentation to appellants. Though Scott evidently talked to appellants about his efforts to market the property, it is not alleged that he ever solicited an offer from them for their former cotenants' one-half interest. The complaint states only that appellants submitted an offer to Barclays by means of a letter addressed to Scott's counsel. But the case cannot be easily distinguished on this ground. The *Ward* court imposed an involuntary trust because the defendant's misrepresentations violated a real estate broker's "duty to be honest and truthful in his dealings" with a prospective purchaser. ■■ ■ This duty, found both in California common law and the real estate law, was also violated under the facts alleged here.

Following the *Ward* decision, the principle that a broker owes a duty of honesty and fairness to all parties to a transaction has been reiterated in other cases (*Brown* v. *Gordon* (1966) 240 Cal.App.2d 659, 667 [49 Cal.Rptr. 901]; *Hale* v. *Wolfsen* (1969) 276 Cal.App.2d 285, 292 [81 Cal.Rptr. 23]), and recognized implicitly by decisions concerning the broker's duty of disclosure toward prospective purchasers. (*Rattray* v. *Scudder, supra,* 28 Cal.2d 214, 223; *Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729 [29 Cal.Rptr. 201, 8 A.L.R.3d 537].) Thus in *Easton* v. *Strassburger* (1984) 152 Cal.App.3d 90, 100 [199 Cal.Rptr. 383, 46 A.L.R.4th 521], the court observed, "[t]he real estate broker's relationship to the buyer is such that the buyer usually expects the broker to protect his interests." This trust and confidence derives both from "the potential value of the broker's service" and the broker's superior knowledge of the complexity of financing. (*Ibid.*)

"[M]any buyers in fact *justifiably* believe the seller's broker is also protecting their interest in securing and acting upon accurate information and rely upon him, . . ." (*Id.* at p. 101, fn. omitted.) Accordingly, the court held that brokers have a duty to disclose material facts "which through reasonable diligence" they should know. (*Id.* at p. 98.) This analysis of the broker's responsibility would equally support a more general duty of honesty and fairness.

The Real Estate Law similarly imposes a "statutory duty of fair and honest dealing by licensees, . . ." (*Realty Projects, Inc.* v. *Smith* (1973) 32 Cal.App.3d 204, 210 [108 Cal.Rptr. 71].) An early Supreme Court decision explained that "the single primary purpose of the act is to require of real estate brokers and salesmen that they be 'honest, truthful and of good reputation.'" (*Riley* v. *Chambers* (1919) 181 Cal. 589, 593 [185 P. 855, 8 A.L.R. 418].) The statutory provisions authorizing disciplinary action against persons holding a real estate broker's license refer to "[a]ny other conduct . . . which constitutes . . . dishonest dealing." (Bus. & Prof. Code, §§ 10176, subd. (i) and 10177, subd. (j).)

A broker representing a seller may breach his duty of honesty and fair dealing by failing to convey a prospective purchaser's offer to the seller and by secretly competing with the purchaser. California Code of Regulations, title 10, section 2785, subdivision (a)(5) defines "dishonest dealing" to include "[t]he willful failure by a listing broker to present or cause to be presented to the owner of the property any offer to purchase received prior to the closing of a sale, unless expressly instructed by the owner not to present such an offer, or unless the offer is patently frivolous." A broker's failure to disclose that he is himself bidding on property also works an unfairness on other prospective purchasers. (Cf. *Buckley* v. *Savage* (1960) 184 Cal.App.2d 18 [7 Cal.Rptr. 328], cert. den. 366 U.S. 910 [6 L.Ed.2d 235, 81 S.Ct. 1086]; *Whitehead* v. *Gordon* (1969) 2 Cal.App.3d 659 [82 Cal.Rptr. 778].) Not only is the broker likely to have an advantage over other bidders because of his knowledge of their offers and the owner's desires, but his contacts with other purchasers may easily lead them to rely on his assistance and forego their own efforts to negotiate for the property. Article 12 of the Code of Ethics of the National Association of Realtors provides: "The REALTOR shall not undertake to provide professional services concerning a property or its value where he has a present or *contemplated interest* unless such interest is specifically disclosed to *all* affected parties." (Italics added.) The 1987-1988 Reference Book published by the California Department of Real Estate cautions, "[a] licensed real estate broker should be particularly careful in this respect [i.e., acting for his own account] inasmuch as a broker's contacts with owners and prospective purchasers of real estate are made largely because of the fact that the broker

advertises and holds himself or herself out to be a licensed agent. Office signs, signs on properties and stationery advertise the fact that the licensee is a licensed real estate broker. Care must be taken to dispel this agency image if the licensee chooses to act as a principal in a real property transaction. It is particularly dangerous for a broker to start out as an agent in a transaction and to switch status to that of a principal before the deal is consummated." ▮ ▬ ▬ ▬ (*Id.* at p. 187-188.)[2]

▮ Thus, while not involving misrepresentation, Scott's alleged conduct falls within the same category as that of the defendant in *Ward* v. *Taggart*: both involved breach of a real estate broker's duty of honest and fair dealing. But in *Ward* v. *Taggart* the court proceeded to impose a constructive trust on a theory of unjust enrichment. "[T]he public policy of this state," it held, "does not permit one to 'take advantage of his own wrong.'" (51 Cal.2d at p. 741.) ▬ The existence of unjust enrichment presents a distinct question. Even if justifying administrative discipline, a broker's breach of his duty of honesty and fair dealing may not necessarily result in unjust enrichment requiring imposition of a constructive trust.

If liberally construed in favor of appellants, the complaint here alleges that appellants' offer was financially superior to Scott's purchase price. While it is not certain that the seller would have accepted appellants' offer, proof of a competitively superior offer is likely to be the strongest evidence available to a prospective purchaser in this situation. (See *Klotz* v. *Fauber* (1972) 213 Va. 1 [189 S.E.2d 45].) To require more would effectively deny relief. Furthermore, the complaint alleges that Scott entirely eliminated appellants' offer from the seller's consideration by both competing secretly for the purchase and failing to transmit their offer to the seller. It is the conjunction of these two acts that is critical. If Scott had failed to disclose his own interest but still had transmitted the offer to the seller or if he had failed to transmit the offer but plainly disclosed his adverse interest, he would not clearly bear the onus of having excluded appellants' bid from consideration. Though the question is a close one, we believe that these alleged facts are enough to invoke the principle that Scott should not be permitted to "take advantage of his wrong" by keeping the cotenant's one-half interest that he acquired by wrongful conduct.

Unlike the defendant in *Ward,* Scott did not resell the property to the purchaser thus earning a secret profit; rather, he continues to hold it in his own name. The principle that one should not be permitted to take advantage of his own wrong implies that Scott is now obligated to transfer the

---

[2] "Pursuant to Evidence Code section 452, subdivision (h), we may take judicial notice of relevant criteria promulgated by a private professional association." (*Easton* v. *Strassburger, supra,* 152 Cal.App.3d at p. 101, fn. 5.)

property to appellants upon their tender of the consideration he paid to Barclays and their assumption of any obligations he may still owe to Barclays. While such a remedy is a novel one in California, there is some precedent for it in other jurisdictions.

In most states, the law concerning a real estate broker's duty toward prospective purchasers is sparse, poorly defined, and evolving. (Comment, *Real Estate Brokers' Duties to Prospective Purchasers,* 1976 B.Y.U. L.Rev. 513; Sinclair, *The Duty of the Broker to Purchasers and Prospective Purchasers of Real Property in Illinois* (1981) 69 Ill. B.J. 260; 55 A.L.R.2d 342.) Some states continue to adhere to the traditional rule of caveat emptor: in the absence of an agency relationship between the purchaser and the broker, the purchaser has no remedy for the acts and omissions of the broker. (*Secan* v. *Dunbar* (1983) 139 Ariz. 503 [679 P.2d 526]; *Ries* v. *Rome* (1958) 337 Mass. 376 [149 N.E.2d 366].) Others have given prospective purchasers a cause of action against a broker without evidence of an agency relationship. Among the reported decisions in these jurisdictions, we have found three cases that have required a seller's broker to convey the property to a prospective purchaser upon tender of the purchase price.

In *Bush* v. *Palermo Realty, Inc.* (Fla. Dist. Ct. App. 1983) 443 So.2d 104, the defendant Palermo, a real estate broker, held a listing agreement on certain property. When plaintiff inquired generally "about any listing of land for sale," he arranged a meeting between plaintiff and the owner of the property. (*Id.* at p. 105.) Plaintiff made a verbal offer at the meeting, but Palermo "stated to those present that there was another interested person who would submit an offer." (*Ibid.*) The other person turned out to be Palermo himself who subsequently purchased the property. Reversing a summary judgment in favor of Palermo, the court held that "[w]hen a real estate broker acts as an intermediary between a seller and a prospective buyer, he is under a duty to deal fairly and honestly with the prospective buyer." (*Id.* at p. 106.) The court treated this duty as being fiduciary in nature, justifying the imposition of a constructive trust in favor of the plaintiff.[3]

In *Harper* v. *Adametz* (1955) 142 Conn. 218 [113 A.2d 136], defendant, Adametz, was a real estate broker representing the owner of an 80-acre farm. The plaintiff, Harper, offered to buy the farm for $7,000. Instead of conveying the offer to the owner, Adametz negotiated to buy the farm himself for $6,500. He informed Harper that the owner had rejected his offer but would sell the best 17 acres of the farm for $6,000. Subsequently, Adametz purchased the property for $6,500 and, purporting to act for the

---

[3] Compare *Quinn* v. *Phipps* (1927) 93 Fla. 805 [113 So. 419], an intellectually impressive decision holding that under the facts the broker assumed a fiduciary responsibility toward a prospective purchaser.

owner, conveyed the 17 acres to Harper for $6,000, collecting a $325 commission on the sale. In this manner, he acquired the remaining 63 acres at a cost of $175. Although Adametz was not an agent of Harper, the court held that he had a duty to "deal honestly" with prospective purchasers and to be faithful to his own principal. While a constructive trust most often arises from relationships "which equity clearly recognizes as fiduciary," the court reasoned that it is appropriate whenever "there is a justifiable trust confided on one side and a resulting superiority and influence on the other." (*Id.* at p. 139.) Imposing a constructive trust, the decree ordered Adametz to convey the remainder of the property to Harper upon payment to the court of $1,000, the difference between plaintiff's original offer for the 80 acres and its purchase price for the 17 acres. (*Ibid.*)

In *Funk* v. *Tifft* (9th Cir. 1975) 515 F.2d 23, the United States Court of Appeals for the Ninth Circuit applied Idaho law in a diversity action. The defendant, Tifft, was a licensed real estate broker who showed the plaintiffs, the Funks, certain Idaho property. The Funks made a written offer that Tifft mailed to the owner. Shortly afterwards, Tifft called the owners to advise them that he was personally making an offer on better terms. When the owner then sold the property to Tifft, the Funks sued to impose a constructive trust. After surveying the case law, the court concluded that "[m]ost modern cases dealing with the relationship of a broker and a buyer impose a duty of fairness and honesty on the broker," and it explicitly characterized this duty as being fiduciary in nature. (*Id.* at p. 25.) By purchasing the property in breach of this fiduciary duty, Tifft became a constructive trustee of the property on behalf of the prospective purchaser. The court ordered that Tifft transfer the property to the Funks upon their tender of the purchase price Tifft paid to the owner and their assumption of any obligation which Tifft still owed to the seller.

While these cases provide precedent for the remedy appellants request in their second cause of action, they invoke the concept of fiduciary duty in a confusing and unnecessary context. The use of the term "fiduciary" to describe both the broker's duty to his principal and his duty to a prospective purchaser suggests that the two duties are in some way comparable. But the interest of seller and buyer are adverse. It should not be inferred that the duties of loyalty, diligence, and disclosure that the seller's broker owes to his client are also owing in some limited or attenuated manner to the buyer.[4]

---

[4] By disclosing his position, a broker may undertake the awkward role of representing both the seller and buyer. But such dual representation, which engenders a host of practical problems, is undesirable as a matter of policy. (Kroll, *Dual Agency in Residential Real Estate Brokerage: Conflict of Interest and Interests in Conflict* (1982) 12 Golden Gate L.Rev. 379; 1 Miller and Starr, Current Law of Cal. Real Estate (1987 Supp.) § 4:18, pp. 45-53.) The courts

The reference to a "fiduciary" duty, furthermore, is unnecessary because each of the decisions recognizes the broker's duty of honesty and fair dealing. ■■■ In California, the breach of this duty can itself constitute an adequate basis for imposition of a constructive trust. *Ward* v. *Taggart, supra,* 51 Cal.2d 736, impliedly holds that a broker's breach of his duty of honesty and fair dealing amounts to an "other wrongful act" within the meaning of Civil Code section 2224.

■■■ Moreover, the precedents we have examined do not address a perplexing aspect of this case. The alleged acts giving rise to the constructive trust may also give Barclays the right to rescind the sale by claiming that Scott breached his fiduciary duty as its broker by purchasing the property.[5] We see no reason, however, why Scott should be allowed indirectly to benefit from his wrong because of a potential remedy of the seller; surely Scott cannot interpose the seller's possible right of rescission as a defense to appellants' action. But Barclays's possible right to rescission poses a practical problem. Being on notice of Barclays's possible equitable rights, appellants might purchase the property subject to a right of rescission. If this is so, they would make a risky investment by tendering to Scott the purchase price of $325,000. To minimize this dilemma, a decree should give appellants a reasonable time to clear their equitable right to the property either by negotiation with Barclays or through a declaratory judgment action before tendering the purchase price and offering to assume any of Scott's outstanding obligations to the seller.

Alternatively, in their first cause of action appellants apply for damages measured by the difference between the price Scott paid for the property and its current market value. A few cases have held that a real estate broker who secretly competes with a prospective purchaser may be liable in damages in the absence of agency relationship with the purchaser. (*Sawyer Realty Group, Inc.* v. *Jarvis Corp.* (1982) 89 Ill.2d 379 [432 N.E.2d 849, 28 A.L.R.4th 189]; *Amato* v. *Latter & Blum, Inc.* (1955) 27 La. 537 [79 So.2d 873].) But appellant's cause of action is apparently based on the theory that they were deprived of an anticipated profit on the property; it assumes that, but for Scott's wrongful conduct, they would have purchased the property and realized a profit on its sale. The scenario is clearly speculative. ■■■ "Anticipated profits cannot be recovered if it is uncertain whether any profit would have been derived at all." (*Block* v. *Tobin* (1975) 45 Cal.App.3d 214, 220 [119 Cal.Rptr. 288].) In any event, our conclusion that

---

should refrain from any interpretation of the broker's duty toward prospective buyers that tends as a matter of law to place the broker in this position of dual representation.

[5] We do not, of course, express any opinion as to the validity of Barclays's possible cause of action. The actual facts—and legal issues—may in reality be very different from those suggested by a reading of appellants' pleadings.

under the facts alleged Scott would hold the property subject to a constructive trust precludes recovery of damages. If Scott is legally obligated to convey the property to appellants upon tender of the purchase price, appellants have suffered no detriment; the property is in fact available to them on the terms they have sought. (Civ. Code, § 3333.)

The judgment is reversed insofar as it relates to the respondents John L. Scott and J. & P. Scott, Inc., and the second cause of action in the second amended complaint. Costs on appeal are awarded to appellants.

Holmdahl, J., and Stein, J., concurred.

Respondents' petition for review by the Supreme Court was denied March 1, 1989.