890 P.2d 615

Byron "Bud" T. BROWN,
Plaintiff–Appellant,

v.

ARIZONA DEPARTMENT OF REAL ESTATE; Jerry A. Holt, Commissioner, Edwin J. Ricketts, Deputy Commissioner; and Patricia Esser Cooper, Acting Commissioner, Defendants–Appellees.

No. 1 CA–CV 93–0368.

Court of Appeals of Arizona,
Division 1, Department D.

Feb. 16, 1995.

Grant Woods, Atty. Gen. by Sydney K. Davis, Chief Counsel, Consumer Protection, and Gerrie L. Switzer, Asst. Atty. Gen., Phoenix, for appellees.

Byron "Bud" T. Brown, in pro. per.

## OPINION

GERBER, Judge.

This appeal results from the superior court's affirmation of the revocation of Byron "Bud" T. Brown's real estate broker's license and assessment of $11,000 in fines by the commissioner of the Arizona Department of Real Estate (ADRE). Brown presents the following questions for our review:

### ISSUES PRESENTED

(1) Does the commissioner of the ADRE have statutory authority to revoke a lapsed real estate broker's license?

(2) Did the ADRE's one year and ninety day delay in rendering a decision violate the law and due process principles?

(3) Did the ADRE's hearing officer violate Brown's non-prosecution agreement by admitting his testimony from the U.S. Senate hearing?

(4) Were the violations supported by substantial, reliable evidence?

(5) Were the civil penalties excessive and redundant?

### BACKGROUND

Byron T. "Bud" Brown (Brown) was one of three persons involved in the sale of the Big Boquillas ranch (ranch) in Northern Arizona to the Navajo Nation (Nation) in 1987. The other two participants were then-Navajo Nation Tribal Chairman Peter MacDonald (MacDonald) and Tom Tracy (Tracy). In late 1986, Brown, MacDonald and Tracy began discussing selling the ranch to the Nation at a substantial profit to themselves. The owner of the ranch at the time was Tenneco West (Tenneco).

Brown agreed to act as Tenneco's agent for the sale in return for a $750,000 commission. Tracy obtained an option to purchase the ranch from Tenneco for $26,500,000. Negotiations with the Nation for the ranch occurred while Tracy had an option to purchase it but Tenneco still held its title. Prompted

by MacDonald, the Nation paid Tracy a non-refundable down payment of $500,000. Brown received $50,000 of the down payment and from those monies paid MacDonald $5,000.

The sale and resale of the ranch occurred over a two-day period. On July 8, 1987, Tracy purchased the ranch for $26,500,000. The next day he sold it to the Nation for $33,417,386, for a $7 million profit. Brown's portion of the profit was to be $3 to $4 million, which he agreed to share with Mac-Donald.

Brown subsequently paid off a $25,000 bank note owed by MacDonald. Tracy wired the bank $25,000 and charged it off as an expense of the ranch purchase. Brown also leased a BMW for MacDonald with a $3,000 down payment check from Tracy. Tracy made the lease payments on the automobile. Brown made additional cash payments to MacDonald, usually in $5,000 increments.

Several months after the ranch transaction closed, the FBI and a federal grand jury began an investigation of MacDonald. In 1988, the U.S. Senate Select Committee on Indian Affairs began its own investigation. Seeking Brown's testimony, senate counsel obtained an order from the U.S. District Court for the District of Columbia granting Brown immunity for his testimony pursuant to 18 U.S.C. sections 6002 and 6005.

Brown was deposed by Senate counsel in November 1988 and agreed to wear a wire and meet further with MacDonald to obtain and record incriminating statements. One month later Brown entered into a written immunity agreement with the U.S. Attorney's office pursuant to 18 U.S.C. section 6002 in return for his cooperation.

In February 1989 Brown testified before the U.S. Senate Select Committee on Indian Affairs. Use of this testimony in the ADRE hearing is one of the central issues presented in this appeal.

### STANDARD OF REVIEW

When an administrative decision is appealed to the superior court, the superior court decides whether the action was illegal, arbitrary or capricious or involved an abuse of discretion. Our court in turn reviews the superior court judgment to determine whether the record contains evidence to support the judgment. *Berenter v. Gallinger*, 173 Ariz. 75, 77, 839 P.2d 1120, 1122 (App.1992).

Neither the superior court nor this court weighs the evidence but determines only whether there was substantial evidence to support the administrative decision. Whether substantial evidence supports the decision is a question of law we review independently. *Id.*

### DISCUSSION

We address each of Brown's arguments in succession.

### (1) *Real Estate Commissioner's Authority to Revoke Brown's Broker's License*

Brown first alleges that the commissioner lacks statutory authority to revoke his lapsed broker's license. Contrary to Brown's assertion, the commissioner has explicit authority to revoke a lapsed license pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 32–2153(D)(2):

> The lapsing or suspension of a license by operation of law or by order or decision of the commissioner or a court of law or the voluntary surrender of a license by a licensee shall not deprive the commissioner of jurisdiction to do any of the following:
>
> . . . . .
>
> 2. Render a decision suspending or revoking the license, or denying the renewal or right of renewal of the license.

If this section were interpreted as Brown argues, an errant licensee could escape discipline simply by allowing a license to expire. On its face, subsection (D)(2) explicitly authorizes the commissioner to do exactly what he did, namely, revoke Brown's lapsed license.

### (2) *Delay in Rendering a Decision*

Brown next complains that the one year and 90 day delay between the date of the ADRE hearing and final decision violates due process principles.

■ An administrative agency must follow the rules it promulgates. *Cochise County v. Arizona Health Care Cost Containment System*, 170 Ariz. 443, 445, 825 P.2d 968, 970 (App.1991). However, due process rights are not necessarily violated by a delay. *Tiffany v. Arizona Interscholastic Ass'n, Inc.*, 151 Ariz. 134, 139, 726 P.2d 231, 236 (App.1986).

The delay clearly violated ADRE's own rules and is hardly a model of efficient decision-making. However, for the violation to rise to a due process infringement Brown must show that he was prejudiced by the delay, causing him to lose a legal right. There is no indication by Brown or in the extended record that this regrettable delay caused him the loss of a legal right or privilege.

### (3) *Brown's Immunity Agreement*

Brown testified before the U.S. Senate on February 7, 1989. He initially refused to testify based on his fifth amendment privilege against self-incrimination, but was compelled to do so by an order of the U.S. District Court for the District of Columbia. This order was issued pursuant to the federal immunity statute, 18 U.S.C. sections 6001–6005. Brown asserts that the admission into evidence of his U.S. Senate testimony violates his immunity agreement under section 6002. This section provides:

> Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
>
> . . . . .
>
> 3) either House of Congress, a joint committee of the two Houses, or a committee or subcommittee of either House,
>
> and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in *any criminal case*, except a prosecution for

perjury, giving a false statement, or otherwise failing to comply with the order.

(Emphasis added.)

Brown contemporaneously entered into an immunity agreement with the U.S. Attorney pursuant to section 6002. Brown asserts that it is the immunity agreement with the U.S. Attorney which bars the use of his U.S. Senate testimony at the ADRE hearing. The U.S. Attorney's immunity agreement, based upon the federal statute, states:

> Based upon the use immunity given Mr. Brown by the U.S. Senate Select Committee on Indian Affairs on November 14, 1988, and his subsequent recorded conversation with Peter MacDonald, Sr., the government agrees not to prosecute him for any possible criminal conduct and criminal and civil liability arising out of the transaction and resulting investigation of the sale of the "Boquillas Ranch" to the Navajo Nation in July, 1987.

### A. Source of Immunity

■ The source of immunity is the fifth amendment of the U.S. Constitution, which guarantees that no one shall be compelled to incriminate himself in a criminal proceeding. *Hoffman v. United States*, 341 U.S. 479, 485–86, 71 S.Ct. 814, 817–18, 95 L.Ed. 1118 (1951).

■ Immunity statutes seek an accommodation between the requirements of the fifth amendment and legitimate government demands to compel testimony. *Kastigar v. United States*, 406 U.S. 441, 445–46, 92 S.Ct. 1653, 1656–57, 32 L.Ed.2d 212 (1972). Because the grant of immunity to secure witness testimony abrogates the fifth amendment privilege against self-incrimination, a statute authorizing immunity is constitutional only if it affords protection commensurate with the fifth amendment. *Id.* at 452–53, 92 S.Ct. at 1660–61; *Murphy v. Waterfront Commission*, 378 U.S. 52, 54, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678 (1964).

■ However, immunity afforded by statute need not be any broader than the constitutional privilege. An immunized witness cannot claim an immunity privilege greater than that afforded by the fifth

amendment. *United States v. DeDiego*, 511 F.2d 818, 822 (D.C.Cir.1975). Immunity may be invoked only in criminal proceedings. *United States v. Cappetto*, 502 F.2d 1351, 1359 (7th Cir.1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975); *United States v. Kates*, 419 F.Supp. 846, 857–58 (E.D.Penn.1976). Immunity granted pursuant to 18 U.S.C. sections 6001–6005 applies to witness testimony "in any criminal case"; it does not preclude "all potential opprobrium, penalties or disabilities which occur as a consequence of the compelled disclosures." *In re Daley*, 549 F.2d 469, 474 (7th Cir.1977), *cert. denied*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977).

## B. Scope of Immunity

 Brown contends that his immunity agreement with the U.S. Attorney pursuant to 18 U.S.C. section 6002 prevents the use of his Senate testimony at the ADRE proceeding. The ADRE asserts that Brown's immunity is limited to criminal proceedings and may not be invoked in an administrative hearing. We look to the reasoning of other jurisdictions in analogous cases because this issue has not yet been addressed by Arizona courts.

Whether immunity granted to a witness pursuant to section 6002 prevents use of immunized testimony at a subsequent state bar disciplinary proceeding was addressed by *In re Daley*. *Id*. *Daley* determined that the privilege functions as a safeguard against rendering an immunized witness criminally liable in a criminal case. For purposes of the fifth amendment, a "criminal case" is one which may result in sanctions imposed if conduct is found to violate criminal law. *Id*. at 474.

Under this ·analysis, a state bar disciplinary proceeding is a determination of an attorney's moral fitness rather than a resolution of criminal charges. *Id*. The *Daley* court stated:

> [D]isbarment and suspension proceedings are neither civil nor criminal in nature but are special proceedings, sui· generis, and result from the inherent power of courts over their officers. Such proceedings are not lawsuits between parties litigant but rather are in the nature of an inquest or inquiry as to the conduct of the · respondent. . . . *Thus the real question at issue in a disbarment proceeding is the public interest and an attorney's right to continue to practice a profession imbued with public trust.*

*Id*. *Daley* makes a clear distinction between penal proceedings intended to redress criminal wrongs and remedial proceedings intended to protect the public and promote integrity. Remedial proceedings are not within the reach of fifth amendment safeguards. *Id*. at 475.

Cases involving administrative proceedings make distinctions similar to those in *Daley*. *Roach v. Nat'l Transp. Safety Bd.*, 804 F.2d 1147 (10th Cir.1986), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1732, 100 L.Ed.2d 195 (1988), addressed the suspension of a pilot's license at an administrative proceeding. The pilot's assertion of immunity turned on whether the hearing was criminal in nature. *Id*. at 1152–53. That court concluded that a license revocation proceeding was "free of the punitive criminal element" and thus the pilot could not refuse to testify. *Id*. at 1154.

Similarly, *Childs v. McCord*, 420 F.Supp. 428 (D.Maryland 1976), *aff'd, Childs v. Schlitz*, 556 F.2d 1178 (4th Cir.1977), involved the use of testimony obtained under section 6002 at a license revocation hearing before the Maryland Board of Registration for Professional Engineers. That court held that the use of testimony was proper because the license revocation hearing was an administrative rather than a criminal proceeding, and thus did not violate the engineer's privilege against self-incrimination:

> Tracking the constitutional language, Section 6002 of the immunity statute prohibits the direct or indirect use of any testimony compelled thereunder 'against the witness in *any criminal case*.' 18 U.S.C. § 6002.

> · · · · ·

The basic question before the Court in this case therefore is whether a disciplinary proceeding before a State administrative agency empowered to revoke a registrant's right to practice his profession

amounts to a "criminal case" within the meaning of the Fifth Amendment.

(Emphasis added.) *Id.* at 431–32. Although the loss of plaintiff's right to practice his profession in *Childs* was a grave consequence, the denial of that right did not amount to a criminal sanction. *Id.* at 434. The court found no meaningful distinction between disciplinary proceedings revoking an engineer's license and the disbarment of an attorney. *Id.* at 436.

In *Maryland State Bar Ass'n, Inc. v. Sugarman,* 273 Md. 306, 329 A.2d 1, 7 (1974), *cert. denied* 420 U.S. 974, 95 S.Ct. 1397, 43 L.Ed.2d 654 (1975), the court addressed the admissibility of testimony derived under section 6002 at an attorney's disbarment proceeding. There, the court held that testimony was admissible because a disciplinary proceeding was not a "criminal case" within section 6002. *Id.* 329 A.2d at 7. Similarly, a Watergate-related case, *Segretti v. State Bar,* 15 Cal.3d 878, 126 Cal.Rptr. 793, 797–98, 544 P.2d 929, 933 (1976), held that testimony given under an immunity grant could be used at an attorney's disciplinary proceeding.

Arizona law is consistent with the reasoning of these jurisdictions. The Arizona Supreme Court has held that a state bar disciplinary action intends to protect the public. As such, the hearing is remedial rather than criminal. *In the Matter of Shannon,* 179 Ariz. 52, 77, 876 P.2d 548, 573 (1994). The *Shannon* court cited *Daley* for the proposition that because disciplinary proceedings are remedial, the right against self-incrimination does not attach. *Shannon,* 179 Ariz. at 70, 876 P.2d at 566.

Brown does not cite any case law supporting the preclusion of his U.S. Senate testimony. On the basis of the analogous case law discussed above, we conclude that a license revocation hearing before the ADRE is a disciplinary, remedial proceeding rather than a criminal proceeding within the meaning of 18 U.S.C. section 6002. We conclude that Brown's previous testimony was properly admitted.

**C. Conflict of Interest**

██ Brown asserts that the ADRE is also bound by his immunity agreement with the U.S. Attorney. Because the attorney general, who represents the ADRE in this action, participated in the ranch investigation by providing vans and equipment, Brown argues that a conflict of interest bars the state's involvement in his administrative proceeding. The state counters that Brown's immunity is a contractual agreement obligating only the U.S. Attorney rather than state agencies.

The relevant portion of Brown's agreement with the U.S. Attorney provides "the government agrees not to prosecute him for any possible criminal conduct and criminal and civil liabilities arising out of the transaction and resulting investigation of the sale of the Boquillas ranch ..."

**(1) Agency Law Principles**

Brown argues that the Arizona Attorney General was acting as an agent for the U.S. Attorney. We disagree.

██ One asserting an agency relationship has the burden of proving it. *Independent Gin Co., Inc. v. Parker,* 19 Ariz.App. 413, 415, 508 P.2d 78, 80 (1973). A person is not an agent for another unless the first person has the right to control the transaction and to have it done for his benefit. *Id.* Agency may be proven by an express contract between the parties or by facts implying a contract. *Corral v. Fidelity Bankers Life Ins. Co.,* 129 Ariz. 323, 326, 630 P.2d 1055, 1058 (App.1981). When a principal has intentionally or inadvertently induced a third person to believe an agency exists, an apparent or ostensible agency is created. *Reed v. Gershweir,* 160 Ariz. 203, 205, 772 P.2d 26, 28 (App.1989).

Here, however, there is no evidence that the Arizona attorney general acted as an agent of the U.S. Attorney or that Brown was induced to believe such an agency existed. The loan of equipment by itself does not constitute a common strategy or assistance with prosecution. The attorney general's van and equipment were utilized only because the location of a meeting between Brown and MacDonald changed at the last minute from a "safe house" previously wired with electronic monitoring equipment to a

different location which was not wired. The loan of equipment by the attorney general, without other involvement, does not create an agency agreement.

### (2) Contract Law Principles

The agreement Brown signed with the U.S. Attorney states that "[t]he foregoing represents the entirety of the non-prosecution agreement between Byron T. Brown and the government." Brown's signature page to the agreement concurs and states that "[n]o promises, commitments or understandings have been made to or for me in connection with the execution of this agreement other than those set forth above."

The word "government" in the agreement refers to the actions of the U.S. Attorney, who signed the document. There is no reference within the agreement to the Arizona attorney general, to state civil or administrative proceedings or to the Arizona statute providing immunity. *See* A.R.S. § 13–4064.

 Agreements not to prosecute a witness are viewed under contract law principles. *United States v. Irvine*, 756 F.2d 708, 710 (9th Cir.1985). The language of the contract is read as a whole and given a reasonable interpretation. *Id.* Under contract law principles, the agreement at issue here is between Brown and the U.S. Attorney, i.e. the federal government. Brown's signed statement avers that no promises or commitments exist beyond those set forth in the agreement. He is estopped from now arguing that the agreement includes additional promises regarding the Arizona attorney general.

### (4) *Were the Violations Supported by Substantial, Reliable Evidence?*

Brown asserts that evidence was not properly admitted and that his violations were not based on substantial, reliable evidence.

### A. Brown's Employment of MacDonald

 Brown argues specifically that the record lacks sufficient evidence to support a finding that Brown employed and paid compensation to MacDonald, an unlicensed salesperson, in violation of A.R.S. sections 32–

2155(A) and 32–2153(A)(6). These sections provide:

> A broker shall employ and pay only legally licensed salesmen, and a salesman shall accept employment and compensation as such only from the legally licensed broker to whom the salesman is licensed or from the licensed corporation of which the salesman is an officer and shareholder.

A.R.S. § 32–2155(A).

> The commissioner may suspend or revoke a license, deny the issuance of a license or deny the renewal or the right of renewal of a license issued under the provisions of this chapter if it appears that the holder or applicant, while a licensee under this chapter, within five years immediately preceding, in the performance of or attempt to perform any acts authorized by such license or by this chapter, has:
>
> . . . . .
>
> (6) Employed any unlicensed salesperson.

A.R.S. § 32–2153(A)(6).

Both parties agree that MacDonald was not a licensed real estate salesperson. The record provides ample evidence that Brown's agreement with MacDonald to sell the ranch to the Nation and share his commissions with MacDonald constitutes employment and compensation within the meaning of A.R.S. section 32–2155(A). The ADRE's conclusion supporting this violation is based on competent evidence. We find no error in that decision.

If the commissioner finds that a broker has employed an unlicensed salesperson, that broker's license may be suspended or revoked pursuant to A.R.S. section 32–2153(A)(6). Brown argues that the evidence does not sufficiently support the revocation order. This argument was squarely addressed and rejected in *Howard v. Nicholls*, 127 Ariz. 383, 388, 621 P.2d 292, 297 (App. 1980), where this court stated:

> Whether this court would have imposed the same sanctions is immaterial. The decision as to the penalty to be imposed is vested by A.R.S. § 32–2153 in the commissioner. Since there was substantial evi-

dence to support his decision to revoke, and revocation was one of the permissible dispositions authorized by the statute, we cannot conclude that his action in that regard was arbitrary or constituted an abuse of discretion.

*Id.* Because of the evidence regarding Brown's employment of MacDonald, we find no abuse of discretion in the commissioner's decision to revoke Brown's broker's license.

### B. Admission of Evidence

██ Brown objects to nearly every exhibit as inadmissible. Transcripts and videotapes of Brown's U.S. Senate testimony, copies of documents obtained from the Navajo Tribal Special Counsel concerning the ranch purchase, copies of deeds, and pertinent letters and memos concerning the ranch purchase are objected to as irrelevant, immaterial and inadmissible hearsay. The state counters that reliable hearsay is admissible in an administrative proceeding and may even be the only support for an administrative decision. *Wieseler v. Prins,* 167 Ariz. 223, 227, 805 P.2d 1044, 1048 (App.1990).

The admissibility of evidence at an administrative proceeding is addressed in A.R.S. section 41–1062(A)(1) which provides:

> Unless otherwise provided by law, in contested cases the following shall apply:
>
> 1. A hearing may be conducted in an informal manner and *without adherence to the rules of evidence required in judicial proceedings.* Neither the manner of conducting the hearing nor the failure to adhere to the rules of evidence required in judicial proceedings shall be grounds for reversing any administrative decision or order providing the evidence supporting such decision or order is substantial, reliable and probative.

(Emphasis added.) The statute clearly states that the rules of evidence required at judicial proceedings are not applicable at an administrative proceeding, as here.

██ An administrative hearing is not a criminal proceeding. Otherwise inadmissible evidence such as hearsay may be considered. *Begay v. Arizona Dep't of Economic Security,* 128 Ariz. 407, 409, 626 P.2d 137, 139 (App.1981). Hearsay may be given probative

weight. In some circumstances, hearsay may even be the sole support of an administrative decision. *Id.* at 409–10, 626 P.2d at 139–40. Arizona cases addressing the use of hearsay evidence in administrative hearings focus on the reliability of the evidence. *Wieseler v. Prins,* 167 Ariz. at 227, 805 P.2d at 1048. Hearsay evidence is considered reliable when circumstances establish that it is trustworthy. *Id.*

Brown's argument that the testimony he objects to is inadmissible does not apply to the ADRE proceeding. Evidence admitted at this administrative proceeding need not meet the higher standard required for admissibility at judicial proceedings. Brown himself was a testifying witness at the U.S. Senate hearing. We have reviewed the hearsay evidence Brown contests and find that it is consistent, coherent, trustworthy and reliable. Because we find evidence at the ADRE hearing was properly admitted, we need not address every hearsay objection he raises.

### C. Brown's Failure to "Deal Fairly"

██ Brown asserts that the ADRE erred in concluding that he violated a duty to "deal fairly" with the Nation and Tenneco, as required by Arizona Administrative Code (A.A.C.) Title 4, Chapter 28, Article 11(A). This rule provides:

R4–28–1101. Duties to Client

A. A licensee owes a fiduciary duty to his client and shall protect and promote the interests of the client. The licensee shall also deal fairly with all other parties to a transaction.

. . . . .

E. A licensee shall not act as principal, directly or indirectly, in a real estate transaction without informing the other parties to the transaction, in writing and prior to or concurrent with any binding agreement, that he or she has a real estate license and is acting as principal.

Brown asserts that because Tenneco and the Nation were not his clients, he did not owe them a duty of fairness. However, the

statute requires that a licensee deal fairly with all parties to a transaction, not only with a licensee's clients. Brown's statutory obligation was to notify both Tenneco and the Nation in writing that he was an indirect principal to the transaction.

Arizona courts have not interpreted A.A.C. R4–28–1101(A) or the words "deal fairly." California imposes a similar duty of honesty and fairness to all parties in real estate transactions. *See Nguyen v. Scott,* 206 Cal. App.3d 725, 253 Cal.Rptr. 800 (1989). In *Ward v. Taggart,* 51 Cal.2d 736, 336 P.2d 534 (1959), the California Supreme Court upheld a purchaser's cause of action against a real estate broker in the absence of an agency relationship. In *Ward,* a real estate broker purchased a property from an owner and immediately resold it for his own profit. Although the broker and plaintiff did not have a fiduciary relationship, the court held that public policy did not permit the broker to take advantage of the purchaser by secretly making a profit. *Id.* 336 P.2d at 537.

We agree with the California standard. Arizona should hold brokers to similar standards of open disclosure. Tenneco's representative testified during his deposition that he learned of the double escrow from the title company, not from Brown. Brown's substantial financial interest in the transaction was material information, and the duty of fairness required him to reveal this information to Tenneco.

Brown owed the same duty of fairness to the Nation. The fact that Tracy held an option to purchase rather than actual title does not relieve Brown of this duty. His failure to disclose to the Nation that he was an indirect principal and that Tracy did not own marketable title during the negotiation process constitutes a violation of his duty to deal fairly.

We find that substantial evidence exists to support the ADRE's findings. *See Havasu Heights Ranch and Dev. Corp. v. Desert Valley Wood Products, Inc.,* 167 Ariz. 383, 387, 807 P.2d 1119, 1123 (App.1990).

**(5) *Excessive and Redundant Civil Penalties***

■ Brown next asserts that fines of $11,000 imposed by the commissioner are excessive and redundant and that the violations charge him more than once for the same offense. He contends that he may not be charged with violation of a law *and* a rule or regulation.

The commissioner is authorized to assess civil penalties of up to $1,000 for each infraction of any statute, rule, regulation or order under A.R.S. section 32–2160.01, which provides:

> Any broker or salesman subject to the jurisdiction of the department who has violated any provision of this chapter *or any rule, regulation or order* promulgated by the commissioner, or who has deviated substantially from the provisions of a public report, or who has engaged in any unlawful practices defined in [A.R.S.] § 44–1522 with respect to the sale or lease of either subdivided lands or unsubdivided lands may be assessed a civil penalty by the commissioner, after a hearing, in an amount not to exceed one thousand dollars for each infraction.

A.R.S. § 32–2160.01(A) (emphasis added). The state asserts that the "or" is used to list the potential infractions, not to mutually exclude penalties for violations of both rules and statutes.

The "or" within the statute refers to reasons or grounds for violations rather than the penalties themselves. The commissioner has authority to assess civil penalties for violations of rules, regulations, orders, unlawful practices or any combination of infractions.

The responsibility to discipline licensees and protect the public lies with the ADRE. *Howard v. Nicholls,* 127 Ariz. at 388, 621 P.2d at 297. The decision as to the penalty to be imposed under A.R.S. section 32–2153 also lies with the commissioner. *Id.* It is immaterial whether this court would have chosen the same sanction. *Sigmen v. Arizona Dep't of Real Estate,* 169 Ariz. 383, 388, 819 P.2d 969, 974 (App.1991). When charges of dishonest or fraudulent intent and purpose are supported by substantial evidence and the action taken is authorized by the governing statute, the agency's action will be upheld. *See Howard v. Nicholls,* 127 Ariz. at

**330**

388, 621 P.2d at 297; *Bear v. Nicholls,* 142 Ariz. 560, 563, 691 P.2d 326, 329 (App.1984).

The ADRE imposed eleven fines of $1,000.00 each. The ADRE found that Brown made substantial and discrete misrepresentations and that his conduct constituted dishonest dealings establishing that he did not act as a person of honesty, truthfulness and good character. *See* A.R.S. §§ 32–2153(B)(3), (5), and (7).

Brown engaged in a series of discrete, fraudulent steps that took place over many months and involved a series of separate misrepresentations to different entities. The lengthy transcript reveals at least eleven instances of dishonest dealings. Each fine rests on separate conduct. The same conduct has not been used twice by the ADRE to support more than one violation. We cannot conclude that the ADRE's findings are redundant or that the fines are excessive. The extensive record provides ample evidence supporting the penalties imposed.

### CONCLUSION

For the foregoing reasons, we affirm the superior court's approval of the ADRE's final order suspending Brown's license and imposing $11,000.00 in fines against him.

FIDEL, P.J., and GRANT, J., concur.