NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

APRIL COBIA, *Plaintiff/Appellant,*

*v.*

ARIZONA BOARD OF NURSING, *Defendant/Appellee.*

No. 1 CA-CV 19-0547

FILED 6-16-2020

Appeal from the Superior Court in Maricopa County
No. LC2018-000334-001
The Honorable Sigmund G. Popko, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

April Cobia, Anchorage, Alaska
*Plaintiff/Appellant*

Arizona Attorney General's Office, Phoenix
By Sunita A. Krishna
*Counsel for Defendant/Appellee*

**MEMORANDUM DECISION**

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court,
in which Judge Maria Elena Cruz and Judge David B. Gass joined.

**W I N T H R O P**, Judge:

¶1             April Cobia ("Cobia") appeals the superior court's order affirming revocation of her registered nursing license by the Arizona State Board of Nursing ("the Board"). Cobia argues the superior court erred by not properly considering the law related to mandatory reporting of vulnerable adults, protection of religious rights, and the Health Insurance Portability and Accountability Act ("HIPAA"). She also contends the court improperly relied on falsified or altered documents and hearsay evidence in making its decision. To the contrary, the record here is replete with multiple and repetitive instances of conduct potentially or actually harmful to patients, co-workers, and the public, in clear violation of the Nurse Practice Act ("the Act"). Cobia was afforded more than sufficient due process throughout administrative and judicial proceedings. Accordingly, we affirm the revocation of her registered nursing license.

## FACTS[1] AND PROCEDURAL HISTORY

### I.     Licensure and Prior Board Discipline

¶2             Cobia was licensed as a registered nurse on February 5, 2002. On April 29, 2006, Cobia entered a Consent Agreement and Board Order, which placed her registered nursing license on probation for a period of twenty-four months after she admitted she falsified medical record entries related to a patient's blood sugar levels and rate of infusion of an insulin drip.

¶3             On September 23, 2009, Cobia consented to a second agreement and order, which extended her probation for an additional twelve months.[2] In evaluating whether to extend her probation, the Board found Cobia had been involuntarily terminated from a recent job without possibility of rehire because of interpersonal conflicts. The Board also considered the evaluation of a psychologist, who recommended Cobia's

---

[1]     We view the evidence in the light most favorable to upholding the Board's decision. *Baca v. Ariz. Dep't of Econ. Sec.*, 191 Ariz. 43, 46 (App. 1997).

[2]     Both agreements included a provision stating Cobia "admits the Board's Findings of Fact and Conclusions of Law." The facts surrounding these incidents are not in dispute and the validity of the agreements is not a subject of this appeal.

probation be extended, her interactions with co-workers be monitored, and she continue to attend anger management counseling.

## II. Cornerstone Health Care

**¶4** In May 2014, Cobia was hired by Cornerstone Health Care ("Cornerstone"), a home-health provider serving vulnerable patients. On May 21, 2014, Cobia called Adult Protective Services ("APS") on a patient's wife to make a report of potential adult abuse, but failed to report the call to her supervisor, as required by Cornerstone's written policy. Cobia received a verbal warning related to the incident, which noted employees have the right to contact APS when they suspect abuse, but must report such referral to an immediate supervisor; Cobia refused to sign an acknowledgement of the warning. In the following months, Cobia was involved in multiple conflicts with patients, resulting in additional written warnings.[3] In October 2014, Cobia personally transported a patient to the emergency room but, contrary to Cornerstone's policy, did not notify her supervisor that the patient was transferred. Following this incident, Cornerstone terminated Cobia for failing to coordinate patient care with agency supervisors on multiple occasions. Cornerstone also reported Cobia to the Board.

## III. Mountain Vista Medical Center

**¶5** In January 2016, Cobia began working at Mountain Vista Medical Center ("Mountain Vista"). In her employment application for Mountain Vista, Cobia noted her reason for leaving Cornerstone was "school"—she did not disclose that her employment had been terminated. As part of orientation, Mountain Vista paired Cobia with a preceptor who gave her assignments, followed her through the day, and checked her work quality. Cobia complained about her first preceptor and was assigned to a second preceptor. The second preceptor worked with Cobia for approximately one week, but refused to continue the assignment after Cobia became argumentative. A third preceptor worked with Cobia and documented additional patient care concerns. None of the preceptors who

---

[3] The record submitted as part of the subsequent administrative hearing also shows Cobia made improper entries in patient medical records during this time. One such entry read, "I do not take orders from speech therapists, physical therapists, occupational therapists, LNPs, CNAs, cows, chickens or roosters, dogs or cats of any kind. I take orders only from M.D.s, D.O.s, and NPs."

worked with Cobia would confirm she was competent, noting Cobia's problems with drawing blood, time management, administering medication, keeping accurate documentation, arguing with authority, improperly interacting with patients and their families, and constantly speaking poorly of past employers and the Board. On or about February 9, 2016, Cobia was involuntarily terminated without possibility for rehire based on patient safety concerns and her inability to perform the basic functions of an ICU nurse.[4]

### IV.     Southwest Network

¶6         In late May 2016, Cobia was hired by Southwest Network ("Southwest"). On her employment application for Southwest, she listed her reason for leaving Cornerstone as "temporary work" and her reason for leaving Mountain Vista as "schedule not working." Cobia did not disclose her involuntary termination from either facility. Soon after Cobia started at Southwest, co-workers reported she was hostile, aggressive, paranoid, refused to listen or follow directions, and spoke of having a gun and a concealed carry permit on multiple occasions. Based on these reports, Cobia was involuntarily terminated with no possibility of rehire after only nine days of work.

### V.     Curo Health Services

¶7         On June 26, 2017, Cobia began working as a home-health nurse with Curo Health Services ("Curo"). Cobia's trainer for the position reported Cobia seemed paranoid. For example, Cobia placed tape over the camera of the company-issued tablet and said the sound should be turned off on the tablet to prevent "corporate" from monitoring employees. Cobia also told her trainer that the bag she used for work was a gun bag. In the following month, as documented by the employer, Cobia had negative interactions with co-workers, patients, and patients' families. Cobia's trainer, as well as Curo's chaplain, noted Cobia had made disparaging comments to a patient about the patient's Mormon faith, which was particularly inappropriate because Cobia was providing end-of-life care at a time many patients find solace in their religious beliefs. The chaplain also reported that Cobia made concerning statements about guns and about

---

[4]       Cobia's employment termination was conducted by phone because her supervisors "felt that she was a threat to the facility."

shooting a neighbor's dog. After one month of working at Curo, Cobia and Curo agreed on a mutual separation. Cobia was not eligible for rehire.

### VI. Termination from Other Health Care Providers

**¶8** In addition to the incidents above, Cobia was terminated from additional jobs. In December 2013, Victory Medical Solutions terminated Cobia's employment after a few weeks of working because she failed multiple competency tests and had conflicts with co-workers. In December 2015, Celestial Care, a home-health agency, terminated Cobia's employment after only a month for failing to follow physicians' orders to properly medicate a patient.[5] In March 2017, Maravilla Care Center terminated Cobia's employment for improper documentation, problems with co-workers, and allegations of racism. In August 2017, North Phoenix Infectious Disease terminated Cobia's employment because of her inability or unwillingness to get along with co-workers.

**¶9** Cobia repeatedly failed to report her terminations in subsequent employment applications. In total, the record shows at least ten instances where Cobia made false statements about past terminations on subsequent employment applications.

### VII. Garden Grove Apartment Complex

**¶10** In addition to the employment issues, Cobia was also involved in concerning incidents outside of work. In November 2016, Cobia called the leasing office of her former apartment complex and yelled racial slurs and profanity at the leasing agent who answered the phone.[6] The leasing agent hung up the call, but Cobia called back and continued screaming and using racially-charged profanity. The leasing agent took a picture of Cobia's number on her phone during the call and put the call on speaker phone so the other four employees in the office could witness the call. After the call, the employees reported the incident to the Tempe Police Department. As a result, Cobia was charged with disorderly conduct,

---

[5] The director of Celestial Care told the Board that Cobia "behaved strangely" and "acted as if she had some sort of disorder that made her hypercritical of everyone else, while not seeing deficits in herself."

[6] It is unclear what prompted this call, but the record shows Cobia had a history of incidents with the complex, including altercations with neighbors, use of racially-charged language and harassment against staff, and eventual involvement in eviction proceedings.

issued a citation, and later ordered to attend an adult diversion program. Cobia did not report the charge to the Board until February 2017, which was well outside the ten-day notice required by state regulation. *See* Ariz. Admin. Code ("A.A.C.") R4-19-403(28).

### VIII. Board Investigation; Administrative and Judicial Proceedings

**¶11** As a result of the 2014 complaint filed with the Board by Cornerstone and Cobia's self-reporting of the disorderly conduct charge, the Board began investigating Cobia. The Board obtained Cobia's employment records dating back to 2013, as well as the police and court records related to Cobia's disorderly conduct charge.

**¶12** As part of the investigation, the Board conducted an interview with Cobia. The interviewer documented that Cobia was "tangential," "hard to follow," and had to be asked to stop using profanity. The interviewer also noted Cobia repeatedly referred to a particular Board staff member ("D.H.") by first and last name, even though D.H. was not involved at all in the instant case. Cobia alleged D.H. had caused all of her employment problems by putting false information about Cobia's previous Board actions online for employers and co-workers to see.

**¶13** The Board also reviewed Cobia's mental health records as part of the investigation. The records reflect Cobia's therapist diagnosed her with generalized anxiety disorder in March 2017. Five months later, Cobia's therapist suggested a revised working diagnosis of paranoid personality disorder, stating Cobia was "plagued with a pervasive distrust and suspiciousness of others that are often interpreted as malevolent" and "persistently bears grudges and mistrust towards others i.e. her relenting pursuit of individuals with the Arizona Nursing Board." The records also reflect Cobia told her therapist that D.H. was the source of all of her problems and that she planned on "exposing" D.H. online.

**¶14** The State filed a complaint and notice of hearing regarding Cobia's registered nursing license. *See* Ariz. Rev. Stat. ("A.R.S.") §§ 32-1606(B)(10), -1663(D), -1664(I). A hearing was held before an administrative law judge ("ALJ"). The ALJ issued a decision to the Board recommending revocation of Cobia's license, and the Board adopted the decision in its entirety. Cobia filed a request for rehearing and review, which the Board denied. Cobia appealed to the superior court, which affirmed the Board's decision. Cobia timely appealed to this court, and we have jurisdiction pursuant to A.R.S. §§ 12-913, -2101(A)(1).

6

**ANALYSIS**

*I.      The Nurse Practice Act*

**¶15**         The Act governs the practice, licensure, and regulation of nurses.  A.R.S. § 32-1601 to -1667.  It also establishes the Board, tasked with administering disciplinary action against individuals found in violation of the Act.  A.R.S. § 32-1606(B)(10).  Corresponding administrative regulations provide additional rules to carry out the intent of the Act.  A.A.C. R4-19-101 to -815.

**¶16**         If the Board finds a nurse has committed unprofessional conduct, it may take disciplinary action, including revocation of the nurse's license.  A.R.S. §§ 32-1601(12)(h), -1663(D).  The Act defines "unprofessional conduct" as including "[a]ny conduct or practice that is or might be harmful or dangerous to the health of a patient or the public."   A.R.S. § 32-1601(26)(d).   The administrative regulations clarify this definition to include, as relevant here:

> 1. A pattern of failure to maintain minimum standards of acceptable and prevailing nursing practice;
> 2. Intentionally or negligently causing physical or emotional injury;
> . . . .
> 7. Failing to maintain for a patient record that accurately reflects the nursing assessment, care, treatment, and other nursing services provided to the patient;
> 8. Falsifying or making a materially incorrect, inconsistent, or unintelligible entry in any record . . . [;]
> 9. Failing to take appropriate action to safeguard a patient's welfare or follow policies and procedures of the nurse's employer designed to safeguard the patient;
> . . . .
> 26. Making a written false or inaccurate statement to the Board or the Board's designee in the course of an investigation;
> 27. Making a false or misleading statement on a nursing or health care related employment or credential application concerning previous employment . . . [;]
> 28. [F]ailing to notify the Board in writing [of a felony or misdemeanor charge], as required under A.R.S. § 32-3208, within 10 days of being charged[; and]
> . . . .

7

31. Practicing in any other manner that gives the Board reasonable cause to believe the health of a patient or the public may be harmed.

A.A.C. R4-19-403.

## II. Standard of Review

**¶17**      We will affirm the Board's decision unless it is "not supported by substantial evidence, is contrary to law, is arbitrary and capricious or is an abuse of discretion." *Ritland v. Ariz. State Bd. of Med. Exam'rs*, 213 Ariz. 187, 189, ¶ 7 (App. 2006) (quoting A.R.S. § 12-910(E)); *see also Ethridge v. Ariz. State Bd. of Nursing*, 165 Ariz. 97, 100 (App. 1989). An action is not arbitrary or capricious if it is "exercised honestly and upon due consideration" of the facts. *Tucson Pub. Sch., Dist. No. 1 v. Green*, 17 Ariz. App. 91, 94 (1972).

**¶18**      We will not reweigh evidence nor substitute our judgment for that of an administrative agency when factual questions and agency expertise are involved. *DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331, 335-36 (App. 1984); s*ee also Berenter v. Gallinger*, 173 Ariz. 75, 77 (App. 1992) ("The purpose of judicial review of an administrative decision is not to decide whether the record supports appellant's version of the facts.").

**¶19**      We review *de novo* an agency's application of law. *Ritland*, 213 Ariz. at 189, ¶ 7.

## III. Mandatory Reporting

**¶20**      Cobia argues the ALJ erred by failing to properly consider the law related to mandatory reporting of abuse or neglect of vulnerable adults. She takes particular issue with the fact that she called APS anonymously, but APS revealed to Cornerstone that she had made the call.

**¶21**      In support of her argument, Cobia relies on A.R.S. § 46-460(A), which states that "all personally identifying information concerning any person who is involved in an adult protective services program, including the reporting source's identity . . . is confidential and may not be released except as provided in subsections B, C and D of this section." Cobia suggests APS violated this statute when it disclosed her identity to Cornerstone. APS, however, is not a party to this action and our jurisdiction is limited to reviewing the Board's decision to revoke Cobia's license. *See* A.R.S. §§ 12-913, -2101(A)(1).

¶22        The record does not support Cobia's contention that the ALJ— and, in turn, the Board and the superior court—failed to consider the laws related to mandatory reporting.  Cornerstone never disputed that Cobia had the right to call APS and stated in the warning Cobia received, "As an employee, you have the rights to call APS or CPS if you suspect an abuse or neglect."  Cornerstone's issue was that Cobia failed to notify her supervisor that she called APS and when asked, denied she made the call.  Cobia later acknowledged that she did not notify her supervisor, in violation Cornerstone's policy and the Act. *See* A.A.C. R4-19-403(9) (stating unprofessional conduct includes "[f]ailing to . . . follow policies and procedures of the nurse's employer designed to safeguard the patient").

¶23        Moreover, apart from the failure to report the APS call, there was additional sufficient evidence supporting Cornerstone's subsequent disciplinary action of Cobia.  The ALJ appropriately concluded Cobia violated the Act on multiple occasions in connection with her employment at Cornerstone, including transporting a patient to the emergency room without informing her supervisor in violation of Cornerstone's policy, improperly keeping patient medical records for personal use after termination from Cornerstone, and making "inappropriate and self-serving entries into patients' medical records" while employed at Cornerstone. *See* A.A.C. R4-19-403(7)–(9).  The Board's findings in this regard were well-supported and were neither arbitrary nor constituted an abuse of discretion.

        IV.        *Religious Discrimination*

¶24        Next, Cobia argues both the ALJ and the superior court judge erred in not properly considering "the law of Conspiracy against Religious Rights," citing 18 U.S.C. § 241.

¶25        As a preliminary matter, we note that 18 U.S.C. § 241 is a federal criminal statute, which does not create a private right of action.  Further, the statute is not applicable in this action.  However, liberally construing the gist of Cobia's contention, she appears to argue the ALJ improperly brought up her religion during the hearing, suggesting some form of bias.  The exchange at issue is as follows:

>        [COBIA]: This [referring to a physician's evaluation of Cobia for her nurse practitioner program] is at Deseret Family Medical, and he is Mormon.  He is a Mormon physician, and I know him out of my ward.
>
>        [ALJ]: Okay.  So who is this doctor?

[COBIA]: His name is Robert Allen.

[ALJ]: And you said you know him out of your ward. Are you also --

[COBIA]: Yes, LDS, and that is how he -- that is how I was connected to him to complete my --

[ALJ]: So you are a practicing Mormon?

[COBIA]: I am, and so I will get to that where it was made comments about me and being derogatory about Mormons.

[ALJ]: Okay.

¶26        There were no additional questions posed to Cobia regarding her faith, and Cobia fails to give any reason on appeal why the above exchange was inappropriate, reflected bias, or constituted error. Further, the record reflects that Cobia herself was the first to bring up her religious beliefs. In her response to the initial Board complaint concerning allegations that she had made derogatory comments about a patient's Mormon faith while working for Curo, Cobia advised she could not have made anti-Mormon statements because she "was raised in the church" and was "an active member in the church." We see no error with the ALJ's clarifying question during the hearing and no evidence of bias or prejudice as a result of either the question or the answer.

V.        *"Falsified" Documents and Hearsay*

¶27        Cobia argues the ALJ and superior court judge erred in considering what Cobia claims are "altered" and "falsified" documents in evaluating her case, as evidenced by alleged conflicts between her exhibits and those submitted by the state. "It is the administrative law judge's duty to resolve all conflicts in the evidence and to draw all warranted inferences," and thus, we will not reevaluate perceived conflicts in evidence. *Aguayo v. Indus. Comm'n*, 235 Ariz. 413, 416, ¶ 11 (App. 2014). Further, our review of the record shows no indication that any of the subject documents were altered or falsified.

**¶28**        Cobia also objects because the ALJ allowed hearsay testimony and claims that by doing so the ALJ exhibited bias against her.[7]  However, these administrative proceedings are not governed by the rules of evidence and hearsay evidence is allowed.  A.R.S. § 41-1092.07(F)(1) (stating an administrative hearing may be conducted "without adherence to the rules of evidence required in judicial proceedings"); *Brown v. Ariz. Dep't of Real Estate*, 181 Ariz. 320, 328 (App. 1995) ("An administrative hearing is not a criminal proceeding.  Otherwise inadmissible evidence such as hearsay may be considered. . . . In some circumstances, hearsay may even be the sole support of an administrative decision.").  Simply stated, failure to adhere to the rules of evidence required in judicial proceedings does not warrant reversal of an administrative decision or order.  A.R.S. § 41-1092.07(F)(1).  The ALJ did not err nor exhibit bias in allowing hearsay evidence.

        *VI.     Due Process*

**¶29**        Cobia argues the ALJ did not give adequate consideration to the evidence she submitted.  She also claims she was not allowed to adequately cross-examine witnesses.  Whether Cobia received adequate due process is a question of law that we review *de novo*.  *See Mack v. Cruikshank*, 196 Ariz. 541, 544, ¶ 6 (App. 1999).

**¶30**        Procedural due process requires a party to have the opportunity to be heard "at a meaningful time and in a meaningful manner."  *Comeau v. Ariz. State Bd. of Dental Exam'rs*, 196 Ariz. 102, 106-07, ¶ 20 (App. 1999) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  It requires a party be given adequate time to present arguments and the opportunity to cross-examine witnesses.  *Volk v. Brame*, 235 Ariz. 462, 468-69, ¶¶ 19, 24 (App. 2014).

**¶31**        Here, the record shows Cobia was afforded adequate due process.  The ALJ gave Cobia extensive instructions regarding the process by which her exhibits would be entered.  Because Cobia failed to submit an exhibit list, the ALJ went through each proposed exhibit with Cobia so that she could name the exhibit and explain how it related to the case.  When it

---

[7]        Cobia also claims the ALJ abused her discretion by allowing "false testimony" from the state's witnesses.  We do not address this argument, as "[i]t is not the prerogative of this court to determine the credibility of witnesses.  The credibility of witnesses is a matter peculiarly within the province of the trier of fact in an administrative hearing."  *Berenter*, 173 Ariz. at 79 (App. 1992).

became clear that they would not have enough time to get through all of Cobia's exhibits, the ALJ scheduled an additional day for the hearing to ensure all evidence could be properly admitted and discussed.[8] The record also reflects that Cobia was given reasonable opportunity to cross-examine all witnesses. The ALJ also asked Cobia on multiple occasions if she had any additional information to present or testimony she would like to give, including after her initial testimony, after the state's cross-examination of Cobia, and before closing arguments. Each time, Cobia declined the opportunity to provide additional information. Finally, the ALJ decision adopted by the Board included numerous citations to Cobia's exhibits, demonstrating the ALJ properly considered the evidence Cobia presented.

### VII.  *Health Insurance Portability and Accountability Act Violations*

**¶32**        Finally, Cobia argues that the ALJ erred in determining she violated HIPAA and the Act by retaining copies of patient records after she was terminated from various facilities. She argues the Board could not know whether she retained patient records because "the [Board] has never had access to my computer, nor have they looked through my computer, nor have I allow [sic] or given them access to look through my computer."

**¶33**        To the contrary, there is sufficient information to support the conclusion that Cobia improperly kept patient medical and hospital records after termination of her employment. As part of the Board investigation, Cobia submitted responses to an investigative questionnaire; along with the completed questionnaire, Cobia submitted medical records from a patient at Cornerstone, hospital records from Banner Thunderbird Medical Center where Cobia worked in 2014, and from various doctors. Later, in the investigative interview, the Board asked Cobia why she had retained patient records. Cobia responded, "[O]h now you're going to try to get me on that. Well, that is what happens when the woman nurse is told that she has to provide the computer, printer, phone and ink, while getting paid $10 an hour." The Board investigator then clarified with Cobia that what she meant was these records were still on her personal computer because she had, in certain instances, used that computer while on the job. During the subsequent administrative hearing, Cobia also submitted an exhibit containing additional patient medical records from her employment in 2005.

---

[8]        Cobia admits during her opening brief that she "presented 162 pages of documents during the hearings."

**¶34** Although Cobia testified at the hearing that she received the medical records from her attorney at the time, the ALJ was in the best position to judge the credibility of witnesses and evaluate conflicts in evidence. *See Aguayo*, 235 Ariz. at 416, ¶ 11; *Berenter*, 173 Ariz. at 79. Cobia violated HIPAA when she retained these records after the patient care was concluded and/or her employment was terminated.[9] As such, we find no abuse of discretion.

### VIII. *Sufficiency of the Evidence*

**¶35** Cobia does not challenge, and has therefore waived any argument regarding, the Board's determination that her actions constitute "unprofessional conduct" under the Act and related state regulations. *See* A.R.S. §§ 32-1601, -3208; A.A.C. R4-19-403. Nevertheless, substantial evidence supports the Board's determination and resulting revocation of Cobia's license. As detailed more fully in the facts above, the record reflects Cobia exhibited unprofessional conduct in the following ways: failing to follow employers' operating policies; acting in an aggressive, argumentative, and hostile manner with co-workers, patients, and patients' families; making inaccurate or inappropriate patient record entries; retaining former patients' records for personal use; refusing or failing to provide proper medications; disparaging a patient's religious beliefs; failing to disclose prior terminations on subsequent employment applications; using racial slurs and threats against apartment complex employees; and failing to report a misdemeanor charge within the time required by regulation. *See* A.R.S. §§ 32-1601(26)(d), (e), (j), -3208(A), (D); A.A.C. R4-19-403(1)–(2), (7)–(9), (26)–(28), (31).

**¶36** The Board explicitly concluded Cobia "has a long history of refusing to take any personal responsibility for her practice or personal interactions with other[s]" and "seemingly refuses to consider the possibility that she has anything to learn from persons to whom she feels superior or that her termination from numerous jobs was based on her actions on the job rather than retaliation for the numerous complaints that she has filed [with] various agencies." The Board also concluded, "Because [Cobia] will not or cannot take responsibility for her actions, it does not appear that she can be regulated at this time."

---

[9] The nurse practitioner consultant at the Board handling Cobia's case testified that it was a violation of HIPAA for Cobia to retain these records, stating, "[Y]ou can only keep records to care for these patients. She wasn't doing that anymore."

¶37 Accordingly, sufficient evidence supports the Board's determination that Cobia committed numerous acts of unprofessional conduct and her nursing activities cannot be effectively regulated, giving the Board adequate cause to revoke her registered nursing license pursuant to A.R.S. §§ 32-1663(D), -1664(N).

## CONCLUSION

¶38 For the foregoing reasons, we affirm the revocation of Cobia's registered nursing license.



AMY M. WOOD • Clerk of the Court
FILED: AA